UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRACY RAYNARD BRADLEY, | : | CIVIL ACTION NO. 3:CV-12-0292 |
| | : | |
| Plaintiff | : | (Judge Nealon) |
| | : | |
| v. | : | |
| | : | **FILED** |
| PRIMECARE MEDICAL INC., et al., | : | **SCRANTON** |
| | : | |
| Defendants | : | MAR 1 9 2013 |

**MEMORANDUM**

PER _____ M. 6 . ↗ _____
**DEPUTY CLERK**

## Background

Plaintiff, Tracy Raynard Bradley, an inmate confined in the State Correctional Institution, Camp Hill, ("SCI-Camp Hill"), Pennsylvania, filed the above civil rights action pursuant to 42 U.S.C. § 1983. The named Defendants are the York County Prison Board; the County of York; Warden Michael Buono; Deputy Warden Clair Doll; PrimeCare Medical Inc.; and the following employees of PrimeCare Medical: Physician Assistant Toby Cantone; Physician Assistant Phil; Nurse Kim, and Nurse Sonja.

Presently before the Court are Defendants' motions to dismiss the Plaintiff's complaint. (Docs. 14, 30). The parties have fully briefed the issues and the motions are now ripe for disposition. For the reasons that follow, Defendants' motions to dismiss will be granted.

## I.     Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)). While a complaint need only contain "a short and plain statement of the claim," FED. R. CIV. P. 8(a)(2), and detailed factual allegations are not required, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Twombly, 550 U.S. at 556). "[L]abels and conclusions" are not enough and "court 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" Twombly, 550 U.S. at 555 (quoted case omitted). Thus, "a judicial conspiracy claim must include at least a discernible factual basis to survive a Rule 12(b)(6) dismissal." Capogrosso v. The Supreme Court of New Jersey, 588 F.3d 180, 184 (3d Cir. 2009) (per curiam).

In resolving a motion to dismiss, the court must "conduct a two-part analysis." Fowler, 578 F.3d at 210. First, the factual elements are separated from the legal elements and the legal conclusions are disregarded. Id. at 210-11. Second, the court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. at 211 (quoted case omitted).

In addition, because Plaintiff complains about "prison conditions," the screening provisions of 42 U.S.C. § 1997e apply, as do the screening provisions of 28 U.S.C. § 1915(e), given that he was granted in forma pauperis status to pursue this suit. The court's obligation to dismiss a complaint under the PLRA screening provisions for complaints that fail to state a claim

2

is not excused even after defendants have filed a motion to dismiss. See Lopez v. Smith, 203 F.3d 1122, 1126 n.6 (9th Cir. 2000). Hence, if there is a ground for dismissal which was not relied upon by a defendant in a motion to dismiss, the court may nonetheless sua sponte rest its dismissal upon such ground pursuant to the screening provisions of the PLRA. See Lopez; Dare v. U.S., 2007 WL 1811198, *4 (W.D. Pa. 2007), aff'd, 264 Fed. Appx. 183 (3d Cir. 2008).

## II.     Allegations in Complaint

Plaintiff alleges that on or about December 27, 2011, he was seen by Nurse Kim concerning a complaint of pain in his leg and a headache. (Doc. 1, complaint). Without looking at his leg, Nurse Kim prescribed Motrin, and informed Plaintiff "if it was a cut or something [he] should put in another sick call slip." Id. Plaintiff told her that his leg was not cut, but was "heated and in pain", and Nurse Kim just "gave [him] what she prescribed and left." Id.

On December 29, 2011, while in his cell, Plaintiff noticed that his leg was "swollen from the hip to the calf." Id. He states that he "told the area Supervisor that [he] needed to go to the X-Hall's Medical, and showed him [his] leg." Id. The Supervisor then "made the necessary provisions" and Plaintiff was sent to the X-Hall Medical where he was seen by Physician's Assistant (PA) Phil. Id. Plaintiff claims that PA Phil "asked [Plaintiff] how it got that way and [he] told him it was from an ingrown hair." Id. PA Phil told Plaintiff that his leg was infected and prescribed "Clyndimycine and Bactrim". Id. Plaintiff asked him about going to a hospital, but he suggested that Plaintiff come back the next day and "he would see what's what then." Id. Plaintiff agreed. Id.

On December 30, 2011, Plaintiff was again seen by PA Phil. Id. He asked if Plaintiff had been taking the medication he prescribed and Plaintiff said he was. Id.

On January 2, 2012, Plaintiff was again examined by PA Phil. Id. Plaintiff states that PA Phil "called Physician Assistant Toby Cantone at this point because it was too much for him and he did not know where else to go." Id. Plaintiff states that PA Cantone "wanted to cut [his] leg open and [he] told her that this was not a sanitary place to do so, and she concurred but still wanted to do it and [Plaintiff] said that this would make it worse" and "why not send [him] to the hospital". Id.

On January 3, 2012, PA Cantone came to Plaintiff's cell and asked him to come to X-Hall. Id. Plaintiff states that when he got to X-Hall, "Dr. Von Keil was there and saw [his] leg and immediately took [him] into the regular room and poked holes in the area which began to drain a little but in actuality didn't do much good because the leg got more swollen down to [Plaintiff's] foot and was hurting still even worse than before." Id. Plaintiff states he was then "placed on Isolation One, where [he] could not go anywhere, [he] was being given nearly 3000 mgs of antibiotics, 1600 mgs of Bactrim twice a day and told that [he] was being given 300 mgs of Clyndimycine four times a day everyday, plus pain pills." Id. Plaintiff states that this went on for "approximately two and a half weeks until they finally sent [him] to the hospital." Id. Once at the hospital, Plaintiff states that he was seen by Dr. Patel who told him that "the antibiotics that were being given to [him] were doing no good because the wound had not been opened, poking holes in it did not do any good." Id. Plaintiff then had to have his leg cut open to drain, so that "the antibiotics would have somewhere to go." Id.

Plaintiff states that he "was still being given excessive amounts of antibiotics for a period which lasted until January 29, 2012 and that was extended until about February 3, 2012, which was when [he] found out that [he] had contracted a disease, from the medication amount and duration." Id. Plaintiff claims that he "again told PA Cantone that the medication was hurting [him] and she started [him] on shots for [his] stomach which was doing [him] no good" and he was "still in pain now from [his] stomach and she still kept pumping the high rate of medication into [Plaintiff]." Id.

Plaintiff alleges that the administration of antibiotics over a course of a month for the wound or abscess has caused him to contract a "disease" which he details in his Motion to Amend the Complaint as "c-dyph". (Doc. 4); (Doc. 7 at 3). Plaintiff alleges that the antibiotics hurt him to the extent that they "killed all the bacteria in the body both good and bad...." (Doc. 4). Plaintiff also alleges that the pain medication he was given to combat the effects of the antibiotics caused him to become "semi-addicted" and that he suffered from withdrawal. (Doc. 7 at 3).

On February 14, 2012, Plaintiff filed the instant action in which he "seek[s] compensatory and punitive damages because the Physical Assistant knew that the medication she ordered was too much to give for such a period of time, PA Toby Cantone knew that the medication she was giving to [Plaintiff] would be harmful, Nurse Kim should have taken more time to see about what she was giving [Plaintiff] medication for." (Doc. 1, complaint).

III.     **Discussion**

   A.     **Eighth Amendment Medical Claim**

In order to establish an Eighth Amendment medical claim, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden Cty. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003). See also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a layperson would recognize the need for a doctor's attention. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." Id. (quotation and citation omitted).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment...." Estelle v. Gamble, 429 U.S. 97, 106 (1976). For instance, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." Id. at 107. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990). Further, a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment. See White

v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). In sum, negligence, unsuccessful medical treatment, or medical malpractice does not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

Further, a prison administrator cannot be found deliberately indifferent under the Eighth Amendment because he or she fails to respond to the medical complaints of an inmate being treated by a prison physician, or because, as non-physicians, they defer to the medical judgment of the inmate's treating physicians. Id. If, however, non-medical prison personnel had "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," liability may be imposed. Spruill, 372 F.3d 236.

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988). See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert. denied, 450 U.S. 1041 (1981). Additionally, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician. Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996). The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Farmer, 685 F. Supp. at 1339.

The allegations in Plaintiff's complaint clearly demonstrate that Plaintiff has received medical attention, as well as medication for the abscess in his leg, and that the attention Plaintiff

7

received lacks the requisite deliberate indifference to support a Section 1983 claim. Plaintiff was immediately seen by medical personnel and treated with pain medication as well as antibiotics for his abscess. Additionally, as soon as the prison medical personnel realized that the abscess was not responding to the antibiotics, they transferred Plaintiff to the hospital, where he was admitted and treated.

At best, Plaintiff's complaint demonstrates his disagreement with medical personnel for not lancing the abscess while in prison, which PA Cantone suggested, but Plaintiff refused, and for Defendants' choice of antibiotics. Plaintiff's disagreement with the medical Defendants course of treatment, however, does not serve as a predicate to liability under § 1983. See White v. Napoleon, 897 F.2d at 108-10 (3d Cir. 1990) (No deliberate indifference claim is stated when a doctor disagrees with the professional judgment of another doctor since "[t]here may, for example, be several acceptable ways to treat an illness."); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (concluding that a claim for deliberate indifference does not arise just because one doctor disagrees with the diagnosis of another). This is particularly so in light of the fact that there are no allegations in the complaint that any of the Defendants intentionally withheld medical treatment from Plaintiff in order to inflict pain or harm upon Plaintiff. See Farmer, 685 F. Supp. 1335; Rouse, 182 F.3d 192. Thus, the allegations in Plaintiff's complaint amount to nothing more than his subjective disagreement with the treatment decisions and medical judgment of the medical staff at the prison. At most, the allegations in the complaint only rise to the level of mere negligence. As simple negligence can not serve as a predicate to liability under § 1983, Hudson v. Palmer, 468 U.S. 517 (1984), Plaintiff's civil rights complaint fails to articulate an arguable claim. See White, 897 F.2d at 108-110.

## B.    Claims against Defendants Buono and Doll

Defendants argue that Plaintiff fails to state a claim against Defendants Warden Buono and Deputy Warden Doll because the complaint reveals that they lack any personal involvement in the wrongs, and Plaintiff's allegations against these Defendants are based solely upon their supervisory roles. (Doc. 31 at 2-5). This Court agrees.

Local government units and supervisors typically are not liable under § 1983 solely on a theory of respondeat superior. See City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 n.8 (1985); Monell v. Dep't of Soc. Servs. Of City of New York, 436 U.S. 658, 690-91 (1978) (stating, municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of). "A defendant in a civil rights action must have personal involvement in the alleged wrongs, liability cannot be predicated solely on the operation of respondeat superior." Rode v. Dellarciprete, 845 F.2d 1195, 1207-08 (3d Cir. 1988). See also Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir. 2003) (citing Rode). Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode, 845 F.2d at 1207. Accord Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293-96 (3d Cir. 1997); Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995). As explained in Rode:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

Rode, 845 F.2d at 1207.

A § 1983 action brought against a person in his or her official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." Monell, 436 U.S. at 690 n.55. "[I]n an official-capacity action, ... a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation; thus, in an official capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law." Kentucky v. Graham, 473 U.S. 159, 166 (1985) (internal quotation marks and citations omitted).

Plaintiff's complaint against Defendants Warden Buono and Deputy Warden Doll suffers from a lack of alleged personal involvement in the events at issue. Aside from naming Buono and Doll as Defendants, the complaint is devoid of any allegation of personal involvement by these Defendants. In fact, in his brief in opposition, Plaintiff states that he "would at this time admit that there was an error in naming Mr. Michael Buono as a defendant in the initial claim because his action in response to the grievances I submitted were only responses, he had no personal involvement in the matter." (Doc. 32 at 1).

With respect Defendant Doll, Plaintiff states in his brief in opposition that "Deputy Warden Clair Doll is the Deputy Warden of treatment, medical answers to him and the policies which are in place are in place by the joint efforts and understanding where the regulations and the policies handed down from the Prison Board through the Deputy Warden to the HAS, Patricia Bennett, as well to the person in charge of infectious disease Nurse Bonny, through to another assistant in the hierarchy of the medical administration named Stephanie." Id. at 2. Plaintiff further claims that "it was Nurse Stephanie who responded to [him] in answer when once [he] asked her who [he] could go to, to ascertain answers concerning matters with medical, she stated

to [him] that the question [he] asked was being addressed by Deputy Warden of Treatment Clair Doll so that they (being her and the Deputy Warden of treatment) can come up with a more suitable way of dealing with such a matter in the future, which is how we get things implemented, as to what [Plaintiff] was going through, because, they were not prepared for such a situation at the time." Id.

The Plaintiff, however, does not allege that Defendant Doll was personally involved in violating Plaintiff's constitutional rights. Instead, it appears that Plaintiff seeks to impose liability upon Doll solely based on Doll's supervisory role. Liability, however, may not be imposed under Section 1983 on the principle of respondeat superior. Capone v. Marinelli, 868 F.2d 102, 106 (3d Cir. 1989). Rather, "supervisory personnel are only liable for the § 1983 violations of their subordinates if they knew of, participated in or acquiesced in such conduct." Id. at 106 n.7. Accordingly, Plaintiff's complaint will be dismissed as to Defendant Doll .

### C.   County of York and York County Prison Board

Once again Plaintiff has identified the county of York and the York County Prison Board as Defendants in his complaint, but he has failed to plead any facts that would establish that the prison board and/or the County of York were liable to him for a Constitutional violation under 42 USC § 1983.

It is noted that the Prison Board, is charged by statute to: "… provide for the safekeeping, discipline and employment of inmates and government and management of the correctional institution." Act of Aug.11 P.L. 147, No. 33 § 7, 61 Pa C.S.A. § 1731 a(3). However, the County of York is not responsible for the policies and management of the County Prison and is not an appropriate party to this action. The Statute specifically states that the rules and regulations for the

11

government and management of the prison and the safekeeping, discipline and employment of the inmates is the responsibility of the York County Prison Board. Act of Aug. 11, 2009 P.L. 147, No. 33 § 7, 61 Pa C.S.A. § 1732 b.

In Monell, 436 U.S. 658, the United States Supreme Court established that municipalities can be liable for those policies that cause a Constitutional tort and also may be held accountable for courses of conduct that are sufficiently permanent as to qualify as customs. When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 791 (3d Cir. 2000); Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996).

A policy is made when a "decisionmaker possessing final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. A course of conduct is considered to be a custom when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law. Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted). Custom may also be established by evidence of knowledge and acquiescence. Beck, 89 F.3d at 971; Fletcher v. O'Donnell, 867 F.2d 791, 793 (3d Cir. 1989). The Third Circuit Court of Appeals held in Fletcher that while a single incident by a lower level employee acting under color of law does not suffice to establish a custom, if a custom can be established by other means, such as proof of knowledge and acquiescence, a single application of the custom can suffice to establish a governmental entity's liability. Id. at 793-94 (citing Oklahoma City v. Tuttle, 471 U.S. 808 (1985); Pembaur v.

Cincinnati, 475 U.S. 469, 482 n.10 (1986)); see also Simmons v. City of Philadelphia, 947 F.2d 1042, 1075 (3d Cir. 1991). Furthermore, a Plaintiff must demonstrate causation, as "a municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation." City of Canton v. Harris, 489 U.S. 378, 388-89 (1989) (internal quotations omitted).

In demonstrating a policy or custom, Plaintiff may rely on a "failure to train" theory and, if so, must assert that Defendants' failure to adequately train employees "reflect[s] a 'deliberate' or 'conscious' choice by [the] municipality such that one could call it a policy or custom." Canton, 489 U.S. at 388-89; Grazier v. City of Philadelphia, 328 F.3d 120, 124 (3d Cir. 2003). This standard will not be satisfied by a mere allegation that a training program represents a policy for which the city is responsible; rather, the focus must be on whether the program is adequate to the tasks the particular employees must perform. Harris, 489 U.S. at 389-90. Moreover, such liability arises "only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." Id.

Plaintiff has failed to satisfy his burden of alleging facts sufficient to support any claim of municipal liability against the York County Prison Board and/or the County of York. The complaint lacks any factual allegations (1) referencing the conduct, time, place, and persons responsible for any official municipal policy or custom endorsing conduct of the Individual Officer Defendants in offering inadequate medical treatment; or (2) identifying a direct causal link between any policy or custom and a violation of Plaintiff's rights. Instead, the complaint is directed at Plaintiff's dissatisfaction with alleged poor medical care by individuals hired by the Prison's contracted health care provider (Prime Care Medical Inc.) and fails to establish a claim

13

against the County of York or the York County Prison Board. As such, the motion to dismiss the County of York and the York County Prison Board will be granted.

A separate Order will be issued.

Dated: March 19, 2013

_____
**United States District Judge**